OPINION
{¶ 1} Pursuant to R.C. 2945.67(A), Crim.R. 12(K), and App.R. 4(B)(4), plaintiff-appellant, State of Ohio ("appellant"), appeals from the May 24, 2005 judgment of the Franklin County Court of Common Pleas which granted the motion to suppress filed by defendant-appellee, Danny K. Morgan ("appellee") in the prosecution for operating a vehicle under the influence of alcohol and operating a vehicle with a per se prohibited concentration of blood alcohol. Appellant sets forth a single assignment of error, as follows:
[1.] The trial court misapplied the totality of circumstances test in ruling that the police officer had no probable cause to arrest the appellee.
 {¶ 2} On July 1, 2004, Ohio State Highway Patrol ("OSHP") Trooper Shad Caplinger ("Caplinger") initiated a traffic stop of appellee's vehicle. Upon investigating, Caplinger determined that there was probable cause to believe that appellee was operating his vehicle while under the influence of alcohol, and arrested appellee. Following his arrest, appellee submitted to a BAC Datamaster breath test to determine his blood alcohol content. The test result indicated that the sample appellee provided contained .110 grams of alcohol per 210 liters of breath.
 {¶ 3} Thereafter, appellee was indicted on one count of operating a vehicle while under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a) and one count of operating a vehicle with a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of breath in violation of R.C.4511.19(A)(1)(d). Both charges were classified as fourth-degree felonies because appellee had previously been convicted of or pleaded guilty to three OVI offenses within six years of the instant offense. See R.C. 4511.19(G)(1)(d). Appellee was also cited for the taillight infraction and failure to wear a seatbelt.
 {¶ 4} On October 8, 2004, appellee filed a "Motion to Dismiss/Suppress Evidence." Therein, appellee made several arguments including that the initial stop of his vehicle was conducted in the absence of any reasonable and particular suspicion of criminal activity; that field sobriety tests were administered in the absence of any reasonable and articulable suspicion that appellee was under the influence of alcohol; that his arrest for driving under the influence of alcohol was not supported by probable cause because Caplinger did not administer field sobriety tests in strict compliance with National Highway Traffic Safety Administration ("NHSTA") standards as required byState v. Homan (2000), 89 Ohio St.3d 421, and that the BAC Datamaster test performed at the OSHP post subsequent to his arrest was not conducted in accordance with applicable Ohio Department of Health ("ODH") standards. Accordingly, appellee asserted that all evidence gathered as a result of his warrantless seizure and arrest, including the results of field sobriety tests, the results of the BAC Datamaster test, and Caplinger's observations and opinions regarding appellee's level of alcohol impairment, should be suppressed.
 {¶ 5} On March 29, 2005, the court held a hearing on the motion. Prior to the commencement of testimony, appellee withdrew the portion of the motion challenging appellant's compliance with ODH standards applicable to administration of the BAC Datamaster test. Accordingly, the issues to be resolved were limited to whether Caplinger had authority to make the traffic stop[1]
and whether Caplinger had probable cause to arrest appellee for operating a vehicle under the influence of alcohol.
 {¶ 6} At the hearing, Caplinger testified that while on patrol at approximately 2:20 a.m. on July 1, 2004, he observed appellee operating an open-air jeep without illuminated taillights in violation of R.C. 4513.05. Caplinger activated his dashboard-mounted videotape camera, which recorded the events that followed.
 {¶ 7} Based upon the taillight infraction, Caplinger initiated a traffic stop. Caplinger testified that "once I had contacted Mr. Morgan, throughout the course of my investigation at that time, I detected a strong odor of alcohol on or about his person." (Tr. 19.) He further observed appellee to have bloodshot and glassy eyes; he conceded, however, that appellee's speech was not slurred. Indeed, Caplinger characterized appellee's speech as "normal" on the Impaired Driver Report he prepared in conjunction with the traffic stop. When questioned, appellee admitted that he had consumed one beer. The videotape confirms this admission; appellee stated that he had one beer around 10:00 p.m.
 {¶ 8} Based upon the "strong" odor of alcohol and the bloodshot and glassy eyes, Caplinger decided to administer three standardized field sobriety tests to appellee: the horizontal gaze nystagmus ("HGN"), the walk-and-turn, and the one-leg-stand. Caplinger testified that he was trained in the detection of alcohol impairment, including the administration of field sobriety tests. According to Caplinger, this training consisted of satisfactory completion of a one week "Alcohol Detection, Apprehension and Prosecution" or "ADAP" course during training at the OSHP as well as on-going training while on active duty.
 {¶ 9} Concerning the HGN test, Caplinger testified that the NHSTA manual describes the test as one proven to reliably demonstrate that a person is under the influence of alcohol. Caplinger averred that performance of the HGN test requires a law enforcement officer to use a pen or other stimulus to track the movement in each of the suspect's eyes for "clues" to alcohol impairment. The first "clue" is the inability of the suspect's eyes to smoothly follow the stimulus; rather, the eye involuntarily jerks as it tracks the stimulus. The involuntary jerking of the eyeball is known as "nystagmus." The second "clue" is distinct nystagmus at maximum deviation. The third "clue" is the onset of nystagmus prior to a 45-degree angle. Caplinger testified that he complied with the training he received in administering the HGN test to appellee.
 {¶ 10} The videotape demonstrates the actual technique Caplinger used in administering the HGN test to appellee. Caplinger testified that appellee exhibited six out of the possible six "clues" on the HGN test; he recorded this same finding on the Impaired Driver Report. Appellee did not object to either the admissibility of the test results or Caplinger's testimony regarding the procedure he followed in performing the test. Caplinger conceded on cross-examination that nystagmus could be caused by factors other than alcohol impairment, such as fatigue, birth defect, caffeine use, nicotine use, aspirin use, eye strain, or head injury.
 {¶ 11} As to the walk-and-turn test, Caplinger testified, and the videotape confirms, that he both instructed appellee on, and demonstrated the test. In addition, Caplinger testified, and the videotape confirms, that he suggested to appellee that he perform the test on the paved berm, as that area appeared to be less uneven than the white line at the edge of the paved road. According to Caplinger, appellee exhibited two out of eight "clues" on the test — he slightly moved his feet once to keep his balance during the instruction portion of the test and pivoted to the right instead of the left when making the 180-degree turn. Appellee did not object to either the admissibility of the test result or Caplinger's testimony regarding the procedure he followed in performing the test. These same findings are denoted in the Impaired Driver Report. According to Caplinger, exhibition of two or more "clues" on the walk-and-turn test is considered a "failure" under NHSTA standards. (Tr. 27.) Caplinger testified, however, that he did not think appellee performed the test poorly; indeed, he averred that appellee "did fairly on that test." (Tr. 28.)
 {¶ 12} With regard to the one-leg-stand test, Caplinger testified, and the videotape confirms, that he both instructed appellee on, and demonstrated the test. Caplinger testified that appellee exhibited only one "clue" on the test — he put his right foot down momentarily during the 30-second test. According to Caplinger, exhibition of one "clue" on the one-leg-stand test is not considered a "failure" by NHSTA standards. (Tr. 29.) Indeed, Caplinger averred that appellee "passed" the test. (Tr. 57.)
 {¶ 13} Caplinger further testified, without objection by defendant, that he administered a Preliminary Breath Test ("PBT") using a properly functioning, hand-held PBT device. Caplinger described the PBT as a tool used by law enforcement to estimate a person's blood alcohol content. He further testified that the PBT machine has instructions for use printed on the front of it; he did not, however, delineate those instructions. Caplinger further averred that the PBT machine is calibrated once a month against the BAC Datamaster and that the results of a PBT test "fairly accurately" depict what a test subject would register on a BAC Datamaster. (Tr. 32.) According to Caplinger, appellee registered a .096 on the PBT machine, which is above the legal limit of .08.
 {¶ 14} Caplinger conceded that the strong odor of alcohol, the bloodshot and glassy eyes, the exhibition of two "clues" on the walk-and-turn test, and the exhibition of one "clue" on the one-leg-stand test, taken singularly, does not necessarily indicate alcohol impairment. However, he further testified that "based upon the totality of circumstances I had to work with at that point," that is, the strong odor of alcohol, the bloodshot and glassy eyes, the complete failure on the HGN test, the "technical" failure on the walk-and-turn test, the slight infraction on the one-leg-stand test, and the results of the PBT, he decided to place appellee under arrest for operating a vehicle under the influence of alcohol. (Tr. 39.)
 {¶ 15} By decision and entry filed May 24, 2005, the trial court granted appellee's motion to suppress. The court first determined that the facts and circumstances supported a reasonable, articulable suspicion that appellee was in violation of R.C. 4513.05, which justified the traffic stop. As neither party contests this determination, it is not at issue here. Next, the trial court considered whether Caplinger had probable cause to arrest appellee. The trial court's decision includes an extensive recitation of both Caplinger's testimony and the court's independent observations derived from reviewing the videotape.
 {¶ 16} The court first addressed Caplinger's testimony regarding the "strong odor of alcohol." The court noted that appellee admitted to drinking one beer at around 10:00 p.m. The court acknowledged that appellee's consumption of one beer, even several hours before the stop, could account for the alleged odor of alcohol. However, the court questioned Caplinger's failure to identify exactly when he detected the odor of alcohol. The court found that such failure created an ambiguity, given that appellee had two passengers in the open-air jeep. The court determined that if Caplinger noticed the odor of alcohol when he first approached the jeep, when he was several feet away from appellee, the odor he detected might have emanated from one of the passengers rather than appellee.
 {¶ 17} The court also noted that appellee's speech was not slurred, and that Caplinger did not assert in either his testimony or the Impaired Driver Report that appellee exhibited abnormal speech suggesting intoxication.
 {¶ 18} The trial court next considered the results of the HGN test. The court noted that whether Caplinger properly administered and fairly evaluated the test must be determined from the weight to be afforded his conclusions. The court further averred that such a determination was particularly important given that the results of the other field sobriety tests did not indicate intoxication.
 {¶ 19} The trial court attributed minimal weight to Caplinger's conclusion that appellee exhibited six out of a possible six "clues" on the HGN test. By way of explanation, the court noted that the videotape revealed that during the nearly two-minute administration of the test, Caplinger jerked his arm several times and at least once dropped his arm (and the pen) to his side so that it was completely out of appellee's field of vision. Averring that case law addressing HGN testing does not elucidate the proper administration of the test, the court inferred from the videotape and the other evidence produced at the hearing that the test was not intended to be particularly difficult to perform, and that HGN results with an impaired motorist are readily apparent without requiring several minutes of testing. The court further noted that it is inconsistent with the scientific purpose of the HGN test for a law enforcement officer to jerk his or her arm or to drop the stimulus completely out of the subject's field of vision, considering that the whole point of the test is to evaluate how smoothly a subject's eyes follow an object across the field of vision.
 {¶ 20} The court next discussed the walk-and-turn test. The court noted that Caplinger deducted one point because appellee moved his feet to maintain his balance while listening to Caplinger's instructions. The court afforded this deduction little weight, averring that appellee was required to stand in an awkward position, with one foot positioned in front of the other, during the instruction portion of the test. The court acknowledged that Caplinger deducted another point for turning to the right instead of the left as instructed. The court also noted that Caplinger described appellee's test performance as "okay," despite his declaration that a two-point deduction constitutes a technical failure of the test. (May 24, 2005 Decision and Entry, at 5.)
 {¶ 21} As to the one-leg stand test, the court noted that Caplinger described appellee's performance as "good" and "passing" despite a one-point deduction for momentarily dropping his right foot. (Id.) The court further noted that review of the videotape revealed that appellee stood still for approximately 30 seconds and confirmed Caplinger's evaluation of appellee's performance.
 {¶ 22} Further discussing the walk-and-turn and one-leg-stand tests, the court noted that appellee complied, without objection, to Caplinger's suggestion that appellee perform the tests on the berm, as that area appeared to be smoother than the edge of the paved road. The court concluded that appellee's performance on these two tests, late at night on a surface off the paved roadway, "must be inferred to be relatively good." (Id.) The court based its conclusion upon its independent observation of the videotape, Caplinger's in-court testimony, and "the reasonable inference that the `standard' for passing such tests as set by NHTSA must have been based upon testing done in daylight and on a dry, perfectly flat surface." (Id. at 5-6.) Explaining its "reasonable inference," the court reasoned that "otherwise, if the NHTSA intended to be applicable at any time of day or night and on any surface no matter how uneven, wet or icy, then just how much darkness, unevenness, water, ice, or mud, is allowed to be overlooked before a driver violates the national testing `standard'?" (Id. at 6.) The court further stated that "[t]here is no evidence on these points, suggesting that either NHTSA demands perfection regardless of the conditions under which a subject is tested — which would be manifestly unfair — or there are standards of which the Court was not advised, or that discretion is reposed in the police officer giving the test." (Id.)
 {¶ 23} Further expounding upon the walk-and-turn and one-leg-stand tests, the court stated: "Moreover, these tests may be standardized but they are not easily performed. The efficacy of marking down the performance of a subject being ordered, late at night, to stand perfectly still while `listening to instructions' for some extended time given by a uniformed Trooper is, for example, debatable." (Id.) The court continued: "It is not illegal to be uncoordinated, nor is it evidence of excessive drinking to move slightly in such an unusual situation. No evidence was adduced at the hearing about why NHTSA concluded that any movement — however slight to keep one's balance while listening to instructions — is indicative of anything, particularly when the surface upon which one is asked to stand can vary greatly due to weather and uneven terrain." (Id.)
 {¶ 24} Finally, as to the PBT, the court simply noted that appellee tested at .096 and that the testing machine measures blood alcohol content, is calibrated only once a month, and is not intended to be equivalent to the scientific BAC Datamaster test administered at a highway patrol post.
 {¶ 25} Following its discussion of the evidence, the court, acknowledging its obligation to examine the "totality of the factual circumstances" in determining whether probable cause supported appellee's arrest, concluded that "[o]verall, this situation did not provide probable cause to arrest." (Id.) In so finding, the court relied, in significant part, upon its own independent observations of the stop and testing gleaned from reviewing the videotape. In particular, the court averred that "[appellee] did not manifest signs of intoxication on the videotape." (Id.) The court also cited Caplinger's "concession" that appellee passed the walk-and-turn and one-leg-stand tests. (Id.) The court further noted that Caplinger's testimony concerning the odor of alcohol and his observations made using the HGN test and the PBT could not be independently verified or duplicated. In addition, the court found Caplinger's testimony about the alcohol smell and the HGN tests to be "shaded somewhat." (Id.) Accordingly, the court granted appellee's motion to suppress the results of the BAC Datamaster test performed at the OSHP post following his arrest and set the case for trial.
 {¶ 26} "Probable cause exists where there is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that the individual accused is guilty of the offense with which he or she is charged." State v. Gunther, Pickaway App. No. 04CA25, 2005-Ohio-3492, at ¶ 20. The legal standard for determining whether a law enforcement officer had probable cause to arrest an individual for operating a vehicle under the influence of alcohol is whether, "at the moment of arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence." Homan, supra, at 427, citing Beck v.Ohio (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142. "Probable cause is a fluid concept revolving on the assessment of probabilities and particular factual contexts not readily or even usefully reduced to a neat set of legal rules." State v. Anez
(2000), 108 Ohio Misc.2d 18, 27, citing Ornelas v. UnitedStates (1996), 517 U.S. 690, 698, 116 S.Ct. 1657, 1663,134 L.Ed.2d 911. Indeed, the United States Supreme Court has cautioned that "* * * because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, `one determination will seldom be useful "precedent" for another.'". Ornelas, supra, quoting Illinois v. Gates
(1983), 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527. In making a probable cause assessment, the court "must examine the `totality' of facts and circumstances surrounding the arrest." Homan, supra, citing State v. Miller (1997),117 Ohio App.3d 750, 761; State v. Brandenburg (1987),41 Ohio App.3d 109, 111. "[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Featherstone, 150 Ohio App.3d 24,2002-Ohio-6028, at ¶ 10, quoting Ornelas, supra, at 699.
 {¶ 27} In this case, appellant argues that the trial court misapplied the "totality of the circumstances" test to the facts adduced at the suppression hearing in concluding that Caplinger did not have probable cause to arrest appellee for operating a vehicle under the influence of alcohol. More particularly, appellant contends that the trial court improperly examined each of the factors Caplinger relied upon and individually found them insufficient to warrant a finding of probable cause. Appellant argues that the United States Supreme Court warned against such a "divide and conquer" approach to the totality of the circumstances analysis in United States v. Arvizu (2002),534 U.S. 266, 122 S.Ct. 744.
 {¶ 28} In Arvizu, the respondent was stopped by a border patrol agent while driving on an unpaved road in a remote area of southeastern Arizona. A search of the respondent's vehicle revealed more than 100 pounds of marijuana, and he was charged with possession with intent to distribute. The district court denied the respondent's motion to suppress, citing ten factors that gave the agent reasonable suspicion to stop the vehicle. The court of appeals examined each of the ten factors in turn and held that seven of them carried little or no weight in the reasonable-suspicion calculus. The court of appeals further concluded that the remaining three factors, singly and collectively, were insufficient to render the stop permissible. Accordingly, the court of appeals reversed the district court's denial of the respondent's motion to suppress.
 {¶ 29} The Supreme Court averred that reviewing courts, in making reasonable-suspicion determinations, must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting criminal wrongdoing. Id. at 273, citing United Statesv. Cortez (1981), 449 U.S. 411, 417-418, 101 S.Ct. 690,66 L.Ed.2d 621. The court further noted that "this process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that `might well elude an untrained person.'" Id., citing Cortez, at 418 and Ornelas, supra, at 699.
 {¶ 30} The court concluded that the court of appeals' evaluation and rejection of seven of the listed factors in isolation from each other did not take into account the "totality of the circumstances." (Id. at 274.) The court, observing that the court of appeals appeared to believe that each observation by the agent that was by itself readily susceptible to an innocent explanation was entitled to "no weight," noted that Terry v.Ohio (1968), 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889, precluded "this sort of divide-and-conquer analysis." (Id. at 274.) Discussing Terry, the court noted that although each of the series of acts the officer observed the petitioner and his companions commit (repeatedly walking back and forth, looking into a store window, and conferring with one another) may have been innocent in itself, the Terry court held that taken together, they merited further investigation. Id., citing Terry
at 22. The court also expressed concern about the court of appeals' "casual reject[tion]" of one of the factors relied upon by the district court, citing the district court's "superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom." (Id. at 276.) Thus, the court, considering the totality of the circumstances and giving due weight to the factual inferences drawn by the detaining officer and the district court, determined that the officer had reasonable suspicion to believe that respondent was engaged in illegal activity. Although we recognize that the procedural posture of Arvizu is different than that of the instant case; we, nonetheless, find Arvizu instructive.
 {¶ 31} In this case, the trial court purported to review the evidence under the totality of the circumstances test. Indeed, the court stated that "[o]verall, this situation did not provide probable cause to arrest." (Id. at 6.) However, a thorough review of the trial court's decision reveals a totality of the circumstances analysis very similar to that disapproved by the Arvizu court. As noted previously, Caplinger cited six factors upon which he relied in arresting appellee — (1) a strong odor of alcohol; (2) bloodshot and glassy eyes; (3) a complete failure (six clues) on the HGN test; (4) a technical failure (two clues) on the walk-and-turn test; (5) a minor infraction on the one-leg-stand test; and (6) the results of the PBT. The court evaluated each of these factors in isolation from one another and dismissed all of them for one reason or another, in contravention of Arvizu.
 {¶ 32} Take, for example, the trial court's position that Caplinger's conclusion regarding the results of the HGN test was "entitled to minimal weight" and was "shaded somewhat." (May 24, 2005 Decision and Entry, at 6.) The trial court inferred, based mainly upon its review of the videotape, that Caplinger did not administer the test properly, despite no objection being lodged to either the admissibility of the HGN test results or Caplinger's testimony regarding the procedure he followed in performing that test. Additionally, no evidence was submitted that Caplinger's testing procedure was improper. Further, Caplinger testified that he had been trained in the proper administration of the test and that he administered the test in accordance with that training. He also testified as to the procedure he used in testing appellee. Based upon our de novo review of Caplinger's testimony and on independent review of the videotape, we disagree with the trial court's rejection of Caplinger's conclusion regarding the results of the HGN test.
 {¶ 33} The trial court also took the position that Caplinger's testimony regarding the odor of alcohol was "shaded somewhat." (Id.) The court appears to have based this finding upon Caplinger's alleged failure to identify exactly when he detected the odor of alcohol. The court found that such failure created an ambiguity, given that appellee was not alone in the open-air jeep. The court determined that if Caplinger noticed the odor of alcohol when he first approached the jeep, when he was several feet away from appellee, he may have detected the odor from one of appellee's passengers.
 {¶ 34} However, we find Caplinger's testimony does not suggest that the odor of alcohol could have derived from one of appellee's passengers. Indeed, Caplinger did not testify that he noticed the odor of alcohol only as he approached the jeep or that the odor of alcohol emanated from the jeep; rather, Caplinger testified that "throughout the course of myinvestigation, I detected a strong odor of alcohol on or about[appellee's] person." (Tr. 19.) In addition, the videotape demonstrates that Caplinger engaged in a lengthy conversation with appellee away from the jeep, during which the two stood no more than a few feet from one another. It was only after this extended discussion that Caplinger questioned appellee about his alcohol consumption. As noted, appellee admitted to consuming one beer, which, as conceded by the trial court, could reasonably account for the odor of alcohol.
 {¶ 35} In addition, the trial court improperly discounted the results of the walk-and-turn test. The trial court regarded the two "clues" of intoxication as "seemingly minor" based, in large part, on its assessment that the heel-to-toe position in which appellee was required to stand while listening to Caplinger's instructions was "awkward." The trial court also found "debatable" the efficacy of evaluating the performance of a subject who is ordered to stand perfectly still for an extended period of time while listening to instructions from a uniformed police officer. However, as set forth in State v. Kolesar
(Sept. 20, 2001), Franklin App. No. 00AP-1435, NHTSA standards require a test subject to maintain the heel-to-toe stance throughout the instruction portion of the test. See, also,Homan, supra, at 425, ("With respect to the walk-and-turn test, * * * it is important that the investigating officer have the suspect balance heel-to-toe while listening to his or her instructions on how to perform the test * * *. The ability or inability of the suspect to keep his or her balance while simultaneously listening to instructions is an important test clue. NHTSA Student Manual, at VIII-11.") We further note that the NHTSA standards "* * * are not subject to reasonable dispute because they are capable of accurate and ready determination by reference to the NHTSA manual itself, a source whose accuracy cannot be questioned given its status as the seminal authority in the area." State v. Frazee, Warren App. No. CA2004-07-085,2005-Ohio-3513, at ¶ 19, quoting State v. Stritch, Montgomery App. No. 20759, 2005-Ohio-1376 at ¶ 16.
 {¶ 36} We disagree with the trial court's conclusion that Caplinger "conceded" that appellee "passed" the test. Although Caplinger stated that he did not think appellee performed the test poorly and, in fact, did "fairly" on the test, he did not state that appellee "passed" the test. Indeed, Caplinger testified that appellee "technically failed" the test.
 {¶ 37} The trial court deemed appellee's performance on the walk-and-turn and one-leg-stand tests as "relatively good" based upon Caplinger's testimony, its independent observation of the videotape, and its own "reasonable inference[s]" concerning the NHTSA standards. As previously noted, however, the trial court mischaracterized Caplinger's testimony regarding the results of the walk-and-turn test. Further, the trial court's reliance on its own observations culled from reviewing the videotape seriously undercuts the principle that Caplinger's observations are entitled to deference given his specialized training in the detection of alcohol impairment. Indeed, this court has stated that "the test is not the facts and circumstances within the trial court's knowledge, but the facts and circumstances within the officer's knowledge." Columbus v. Anderson (1991),74 Ohio App.3d 768, 771, 600 N.E.2d 712. See, also, State v. Vaughters,
Cuyahoga App. No. 86730, 2006-Ohio-2474, at ¶ 10. (A court reviewing a law enforcement officer's [probable cause] determination must give due weight to the officer's training and experience and view the evidence through the eyes of those in law enforcement.) Id., citing Arvizu, supra.
 {¶ 38} Ohio courts of appeal have reversed trial court rulings on motions to suppress evidence which erroneously found no probable cause to arrest in impaired driving cases, based upon a totality of the circumstances analysis. In State v. Penrose
(June 25, 1992), Logan App. No. 8-91-22, the defendant was stopped by a state trooper at 2:39 a.m. for two vehicle infractions — no rear license plate light and a snow obstructed rear window. There was no indication of impaired driving. The trooper testified that the defendant was groggy, had very bloodshot eyes, very slurred speech, exhibited an odor of alcohol about his person, had poor coordination, and admitted to drinking three and one-half beers. The trooper further testified that the defendant failed the walk-and-turn test, the HGN test, and the one-leg-stand test. The trial court granted the defendant's motion to suppress, finding no probable cause to arrest. In so finding, the trial court considered only the defendant's performance on the walk-and-turn and one-leg-stand tests. The court of appeals determined that the trial court improperly disregarded the uncontroverted initial observations of the trooper including defendant's groggy appearance, slurred speech, bloodshot eyes, odor of alcohol and admission of drinking three and one-half beers. The court returned the case for trial, finding that probable cause had been established by the totality of the circumstances.
 {¶ 39} Similarly, in State v. Bokesch (Apr. 30, 2002), Portage App. No. 2001-P-0026, a police officer responded to a one-car accident and found the defendant, the apparent driver, lying alongside the road, approximately ten feet from the car. The officer detected a strong odor of alcohol. Later, at the hospital, a state trooper noted the same odor of alcohol and observed that the defendant had glassy and bloodshot eyes. The defendant exhibited six out of six clues on the HGN test. The trial court granted the defendant's motion to suppress, finding no probable cause to support the charge of driving under the influence of alcohol. In particular, the trial court noted that administering the HGN test to a person on a hospital bed with possible head injuries was neither approved procedure nor trustworthy. The court of appeals agreed that the administration and results of the HGN test were questionable in light of the fact that no information was obtained from medical professionals regarding the defendant's condition. Nevertheless, the court found, viewing the totality of the circumstances, including the single car accident, the first officer on the scene discovering the defendant lying near the car smelling of alcohol, and the trooper's testimony regarding the defendant's slurred speech, glassy, bloodshot eyes, and the odor of alcohol on his person, that the state presented sufficient evidence to establish probable cause and remanded the case for trial.
 {¶ 40} Finally, in Frazee, supra, a police officer stopped the defendant after observing erratic driving. The officer detected a strong odor of alcohol and slurred speech, and the driver admitted to consuming six beers. The only field sobriety test administered was the HGN test. The defendant moved to suppress the officer's observations and the results of the HGN test. The court of appeals determined that even if the HGN test results were properly suppressed, the trial court erred in finding the officer did not have probable cause to arrest the defendant. In so finding, the court cited the officer's testimony regarding the defendant's erratic driving, the strong odor of alcohol, the slurred speech, and the admission to drinking six beers. The court remanded the case for trial.
 {¶ 41} In the present case, Caplinger's uncontroverted testimony established that he arrested appellee based upon the results of the field sobriety tests, his observations of bloodshot and glassy eyes, and the "strong" odor of alcohol "on or about" appellee's person and the PBT results. In addition, appellant admitted to having consumed alcohol. We find the accumulated observations of the trooper, even without considering the PBT results,[2] sufficiently establish probable cause for the arrest.
 {¶ 42} After considering the entire record, we find appellant's assignment of error to have merit. Accordingly, the assignment of error is sustained and the judgment of the Franklin County Court of Common Pleas is hereby reversed and remanded for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed, and cause remanded.
Brown and Travis, JJ., concur.
[1] Appellee argued that this decision required probable cause; the court applied the test of whether specific and articulable facts, taken together with rational inferences from those facts, reasonably warranted an investigative stop.
[2] We find probable cause without considering the PBT results and, therefore, do not address the admissibility of those results.