[Cite as *State v. Jackson*, 2018-Ohio-1068.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-309 |
| | | (C.P.C. No. 14CR-2143) |
| v. | : | |
| | | (ACCELERATED CALENDAR) |
| Cameron E. Jackson, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 23, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert,* for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Clark Law Office*, and *Toki Michelle Clark*, for appellant. **Argued:** *Toki Michelle Clark.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Cameron E. Jackson, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of possession of marijuana and one count of trafficking in drugs. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed April 24, 2014, plaintiff-appellee, State of Ohio, charged Jackson with one count of possession of marijuana, in violation of R.C. 2925.11, a second-degree felony; and one count of trafficking in marijuana, in violation of R.C. 2925.03, a second-degree felony. The indictment charged Jackson along with two codefendants, Anthony A. Byrd and Ronald L. Hayward. Jackson entered a plea of not guilty.

{¶ 3} On May 8, 2015, Jackson filed a motion to suppress. The state filed a memorandum contra Jackson's motion to suppress, and the trial court set the matter for hearing.

{¶ 4} At a suppression hearing on June 8 and 9, 2015, Officer Stephen Carr of the Columbus Division of Police testified that around 3:15 a.m. on April 14, 2014 he responded to a dispatch of a possible theft in progress at a commercial trucking terminal located at 1929 Lone Eagle Street. Officer Carr testified the information he had upon arriving at the scene was that a truck driver at the trucking terminal saw several men removing cargo from a detached trailer and placing the cargo into two rental trucks. Before Officer Carr arrived, an unmarked cruiser entered the trucking terminal and observed the rental vehicles but did not observe any people. Officer Carr then arrived on the scene in a marked cruiser and he said a man named David Cline flagged him down and identified himself as the person who called 911 to report the possible theft and that Cline told him it was very unusual for anyone to be unloading anything at that time of day. Cline said he saw three men moving cargo from a trailer into two Penske rental trucks.

{¶ 5} When he found the trailer and the two rental vehicles, Officer Carr said he observed Hayward, Byrd, and Jackson "casually just standing there," and when the officers told the men they were there to investigate a possible theft, the three men denied there was anything of that nature going on. (June 8, 2015 Tr. Vol. I at 35.) Officer Carr said Hayward did most of the talking. Hayward told the officers the men had been "contracted" to unload the trailer, but when officers asked them who owned the trailer, the men could not name the owner. (June 8, 2015 Tr. Vol. I at 35.) Officer Carr further testified there were very large crates of watermelons sitting in the grassy area behind the trailer but when he asked the men what they were doing with the produce, the men gave a vague response about unloading the produce into the grass and possibly putting it on the loading dock later.

{¶ 6} Officer Carr testified that the men told him that a man who worked security for the trucking terminal, "a guy named Bob," knew they were there and that "it was completely okay for them to be there." (June 8, 2015 Tr. Vol. I at 36.) Officer Carr then went to a mobile home parked at the entrance of the trucking terminal, and the occupant of that mobile home put Officer Carr in touch with the person who runs the trucking

terminal. Approximately one-half hour later, the manager of the trucking terminal, whom Officer Carr identified as Mr. Seymour, arrived at the scene.

{¶ 7}    In the time it took for Seymour to arrive at the scene, Officer Carr said he and the other officers "kind of stood around" with Hayward, Byrd, and Jackson and engaged in "very casual conversation," noting that the three men "didn't seem very concerned about [police] being there."  (June 8, 2015 Tr. Vol. I at 41.)  Officer Carr said the three men provided police with their identification cards.  Additionally, Officer Carr said Hayward spent some time on the phone trying to get in contact with the person Hayward said had contracted the men to unload the truck.  Officer Carr said the three men would have been free to leave during this approximately 30-minute period while everyone waited for Seymour to arrive "[i]f they wished to."  (June 8, 2015 Tr. Vol. I at 44.)

{¶ 8}    Once Seymour arrived at the trucking terminal, the police officers allowed Seymour to talk to Hayward, Byrd, and Jackson to discern whether the three men had leased a space on the lot or were working for someone who had leased a space.  After a brief conversation, Seymour went to look at some paperwork in his office and then told police the three men "did not know anything about the owner of the trailer."  (June 8, 2015 Tr. Vol. I at 44.)  Officer Carr said Seymour also told him that it was unusual to unload crates into wet grass.

{¶ 9}    Officer Carr testified that there were two Penske rental vehicles parked near the trailer, a box truck with no windows, and a cargo van.  The officers asked Hayward, Byrd, and Jackson about the rental vehicles several times and whether they were loading cargo into those vehicles "and each time the answer was, no, they had nothing to do with the rental trucks."  (June 8, 2015 Tr. Vol. I at 48.)  Officer Carr testified that "with the totality of everything that was in front of me unable to identify the owner of the trailer, unable - - this security person was not existing and the person that ran the dock saying that this simply did not look right to him," he and the other officers "believed there was an indeed a distinct possibility a theft was occurring."  (June 8, 2015 Tr. Vol. I at 46.)  At that point, Officer Carr said he opened the back of the box truck "expecting to find crates of watermelons," but instead "found very large plastic wrapped packages that were numbered like they were in an exact sequence," and Officer Carr recognized the packages immediately as the typical packaging of narcotics.  (June 8, 2015 Tr. Vol. I at 49.)  Officer Carr said the

packages "were wrapped very well," and that even though he was "pretty sure at that point they were marijuana," he "couldn't even smell" anything from the packages. (June 8, 2015 Tr. Vol. I at 62.) Officer Carr reiterated that he opened the box truck at that point because "based on everything we had, we believed that the cargo was indeed being stolen" and that the three men were putting something into the rental vehicles. (June 8, 2015 Tr. Vol. I at 48-49.)

{¶ 10} After opening the box truck, the police officers detained Hayward, Byrd, and Jackson and placed each of them in a separate police cruiser. Officer Carr said he had a discussion with the other officers after the fact that if Hayward, Byrd, and Jackson had simply gotten in a car and drove away before officers opened the box truck, the officers would not have been able to stop them. Officer Carr testified that "[u]p to that point [when officers actually detained the three men, the officers] did not feel the need to detain anybody." (June 8, 2015 Tr. Vol. I at 111.)

{¶ 11} After he looked in the box truck and detained Hayward, Byrd, and Jackson, Officer Carr testified he walked to the front of the rental van and, using his flashlight, looked in the windshield and "saw similar looking bundles in the back of the van that matched what [he] saw in the back of the box truck." (June 8, 2015 Tr. Vol. I at 50.) The cargo van did not have any windows on the rear side, but Officer Carr testified you could see to the back of the vehicle by looking through the windshield. A short time later, the K-9 unit arrived, and the K-9 "[i]mmediately alerted" on the rental vehicles. (June 8, 2015 Tr. Vol. I at 50.) Eventually, the narcotics detectives came to the scene and "drew up a search warrant," at which point Officer Carr was relieved of his duties. (June 8, 2015 Tr. Vol. I at 52.) Jackson had been seated in the back of Officer Carr's cruiser but police moved him to a different cruiser so that Officer Carr could leave the scene. While he was driving to the substation, however, Officer Carr said he heard something fall in the back seat and he pulled over, finding a key for a Penske vehicle.

{¶ 12} On cross-examination, Officer Carr said he did not believe there was an immediate risk that any potential evidence inside the box truck would be destroyed or moved away because he "didn't know it was evidence until [he] looked in" the box truck. (June 8, 2015 Tr. Vol. I at 78.) Officer Carr also agreed that he wrote in his report of the incident that he had a "reasonable suspicion to believe that cargo was being stolen" at the

time he opened the box truck. (June 8, 2015 Tr. Vol. I at 80.) Officer Carr further stated there was no smell of marijuana in the trucking terminal. Additionally, Officer Carr estimated that from the time he first arrived on the scene to when he opened the box truck, more than one hour had elapsed.

{¶ 13} Officer Joshua Kinzel of the Columbus Division of Police testified that when he arrived at the trucking terminal, he saw approximately 100 watermelons lying all over the ground by the detached trailer. Officer Kinzel said that when officers asked the three men questions, it was Hayward who gave "actual answers" and that Byrd and Jackson "kind of followed suit with whatever [Hayward] said" by nodding their heads. (June 8, 2015 Tr. Vol. I at 126.) Officer Kinzel said the three men were free to leave up until the point when the officers found the marijuana in the back of the box truck. When Officer Kinzel asked the men about the rental vehicles, he said that Hayward told him "they don't know anything about the trucks," and that none of the three men indicated that the rental vehicles belonged to them. (June 8, 2015 Tr. Vol. I at 131.) Officer Kinzel could not recall whether Byrd or Jackson ever gave a verbal response denying any connection to the rental trucks. Officer Kinzel testified that he, along with Officer Carr, made the collective decision to open the box truck together. However, Officer Kinzel testified his primary reason for opening the box truck was for officer safety, though he agreed that approximately one and one-half hour passed from the time he first arrived to the time the officers opened the box truck. Officer Kinzel testified that one of the other officers, Officer Tonya Allen, heard a rolling overhead door shut as soon as the officers arrived on the scene, and because of that, the officers "didn't know if there was somebody else in the truck." (June 8, 2015 Tr. Vol. I at 134.)

{¶ 14} Byrd testified that his friend, Shaunika Eakins, rented the box truck and cargo van in her name but that Byrd paid for the rental of the vehicles. He said it was his understanding that even though his name was not on the rental agreement, he controlled the rental vehicles. Further, Byrd said he never denied affiliation with the rental vehicles to police.

{¶ 15} After the suppression hearing, on July 6, 2015, the trial court denied Jackson's motion to suppress. The trial court stated its decision relied upon Officer Carr's testimony, which the trial court "found to be the most credible." (July 6, 2015 Tr. at 319.) Specifically, in denying Jackson's motion to suppress, the trial court stated:

> Detective Carr also stated that on cross-examination from Mr. Byrd's attorney, that what constituted criminal activity, he thought, was the 9-1-1 call, no legitimate explanation for being there, and the conversation with Mr. Seymour that things didn't look right. He also based his reasonable suspicions on cross from Mr. Hayward's attorney stating that he was unable to - - the defendants were unable to ID the trailer owner, that there was no security person named Bob that they said it was okay for them being there, and that Mr. Seymour also said things did not look right. Further, he based his reasonable suspicions on Mr. Jackson's attorney, on Mr. Cline stating that there was unusual activity for that time of day and that Mr. Seymour said something was not right and was unusual. Therefore, there was reasonable suspicion to look in the box truck and the van.

(July 6, 2015 Tr. at 320.) The trial court further stated that after the officers looked in the box truck and van, there was probable cause to arrest Hayward, Byrd, and Jackson.

{¶ 16} The matter then proceeded to a joint jury trial for all three defendants beginning October 5, 2015. The evidence at trial largely duplicated the evidence presented at the suppression hearing, though additional witnesses testified at trial. Specifically, Claude W. Seymour, Jr., the manager of the trucking yard who goes by the name Wes, did not testify at the suppression hearing but did testify at trial. Seymour testified that ordinarily a trailer would be backed up to the dock so that a forklift could access the inside of the trailer to unload it. However, Seymour said that the way the trailer that Hayward, Byrd, and Jackson were unloading was positioned with the rear of the trailer abutting a wet, grassy area, there would be no way to use a forklift to unload it. Seymour recalled one of the defendants, though he was not sure which one, telling him they planned to use a forklift to reload the trailer. Seymour said that statement did not make sense to him given the location of the trailer.

{¶ 17} The state also presented evidence at trial regarding the amount of marijuana found at the scene. Police recovered a total of 122 packages of marijuana. Of that total, 66 packages came from the box truck, 46 packages came from the van, and 10 packages came from the trailer, in the bottom of a large box concealed by watermelons. All together, the packages weighed approximately 2,900 pounds. Further testing revealed the packages contained a total of 44,000 grams of marijuana.

{¶ 18} At the conclusion of the trial, the jury returned verdicts against Hayward, Byrd, and Jackson, finding them guilty of possession of marijuana and trafficking in marijuana. After a November 4, 2015 sentencing hearing, the trial court sentenced Jackson to 8 years' imprisonment and imposed a 12-month driver's license suspension and a $7,500 fine. The trial court journalized Jackson's convictions and sentence in a November 4, 2015 judgment entry.

{¶ 19} Jackson appealed, arguing the trial court erred in denying the motion to suppress. This court agreed with Jackson, concluding the trial court erred in applying the reasonable suspicion standard to the search of the box truck and that the trial court should have determined whether there was probable cause to search the box truck under the automobile exception to the warrant requirement. *State v. Jackson*, 10th Dist. No. 15AP-1089, 2016-Ohio-7669, ¶ 25-27 ("*Jackson I*"). We remanded the case for the trial court to "make the appropriate factual findings relevant to a probable cause analysis for the search of the box truck and then determine, in the first instance, whether officers had probable cause to search the box truck." *Id.* at ¶ 27.

{¶ 20} On remand, the trial court once again denied Jackson's motion to suppress. The trial court issued a written order and entry on March 30, 2017 concluding "[t]he totality of the circumstances leading up to the opening of the box truck gave the officers ample probable cause to believe that the box truck would contain contraband and search the box truck under the automobile exception." (Order & Entry at 6.) In denying Jackson's motion to suppress, the trial court additionally concluded the officers had probable cause for their subsequent search of the cargo van.

{¶ 21} Subsequently, on May 1, 2017, the trial court issued an amended judgment entry noting it had overruled Jackson's motion to suppress on remand and reinstating Jackson's original judgment of conviction entered November 4, 2015. Jackson timely appeals.

## II. Assignment of Error

{¶ 22} Jackson assigns the following error for our review:

> The trial court erred in overruling appellant's motion to suppress evidence.

### III. Analysis

{¶ 23} In his sole assignment of error, Jackson argues the trial court erred in overruling his motion to suppress. More specifically, Jackson asserts the officers lacked probable cause for the search of the box truck.

{¶ 24} " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " (Citations omitted.) *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 25} The Fourth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, as well as Article I, Section 14 of the Ohio Constitution, prohibits the government from conducting warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. *State v. Mendoza*, 10th Dist. No. 08AP-645, 2009-Ohio-1182, ¶ 11, citing *Katz v. United States*, 389 U.S. 347, 357 (1967), *superseded by statute on other grounds*. There is no dispute here that the police officers opened and searched the box truck without a warrant. In *Jackson I*, we determined the automobile exception to the warrant requirement would apply to the search of the box truck, and we remanded the matter to the trial court to determine whether the officers had probable cause for the warrantless search of the box truck. *Jackson I* at ¶ 25-27.

{¶ 26} "The automobile exception is a 'specifically established and well delineated' exception to the warrant requirement." *State v. Bazrawi*, 10th Dist. No. 12AP-1043, 2013-Ohio-3015, ¶ 18, quoting *United States v. Ross*, 456 U.S. 798, 825 (1982), citing *Carroll v. United States*, 267 U.S. 132 (1925). " '[U]nder the automobile exception to the warrant requirement, the police may search a motor vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband.' " *Bazrawi* at ¶ 18, quoting *State v. Battle*, 10th Dist. No. 10AP-1132, 2011-Ohio-6661, ¶ 33. In the context of an automobile search, probable cause is " 'a belief, reasonably arising out of circumstances known to the

seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.' " *State v. Parrish*, 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 27, quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Carroll* at 149. "This probable cause standard requires specific, objective facts which would justify the issuance of a search warrant by a judge or magistrate." *Parrish* at ¶ 27. Thus, "[t]he determination of probable cause is fact-dependent and turns on what the officer knew at the time he made the stop and/or search." *Battle* at ¶ 34. "Probable cause sufficient to justify a search exists where, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*, citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

{¶ 27} In concluding the totality of the circumstances leading up to the opening of the box truck gave the officers probable cause to search the box truck under the automobile exception to the warrant requirement, the trial court listed the factors that aided its decision, including:

> (1) the chaotic scene of broken and intact watermelons in the wet grass, (2) statements regarding the unusualness of cargo being unloaded in the middle of the night, (3) unloading hundreds of presumably heavy watermelons near the wet grass as opposed to the loading dock with access to a forklift, ([4]) the defendants' inability to state who owned the trailer, ([5]) the defendants' reference to the non-existent "Bob" the security guard, ([6]) Hayward's express disavowal of the defendants having any affiliation with either the rental van or the rental truck in contrast to Cline's statements that he saw men loading cargo into the trucks, ([7]) Hayward's statement that the defendants had nothing to do with the rental van or truck, which would lead one to wonder where they were going to put the watermelons after unloading them, ([8]) Seymour's conclusion that the defendants' explanation for what they were doing was nonsensical, and ([9]) Defendant's vague answers.

(Order & Entry at 6-7.)

{¶ 28} Giving deference to the trial court's factual findings, we must independently determine whether these facts are sufficient to conclude the officers had probable cause for the search of the box truck. *Roberts* at ¶ 100. We are mindful that probable cause is a "fluid concept" based on very specific, particular factual contexts, and " 'because the mosaic which

is analyzed for a * * * probable-cause inquiry is multifaceted, "one determination will seldom be a useful 'precedent' for another." ' " *State v. Morgan*, 10th Dist. No. 05AP-552, 2006-Ohio-5297, ¶ 26, quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996), quoting *Gates* at 238 fn. 11.

{¶ 29} Jackson first argues law enforcement needed some separate exigency to conduct a search of the rental vehicles under the automobile exception.   Contrary to Jackson's argument, however, this court has noted that "the automobile exception has no separate exigency requirement." *Battle* at ¶ 27, citing *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999).   Instead, "[o]nce a law enforcement officer has probable cause to believe that a vehicle contains contraband, the officer may search the motor vehicle based upon the automobile exception to the warrant requirement." *Battle* at ¶ 27, citing *State v. Moore*, 90 Ohio St.3d 47, 51 (2000).

{¶ 30} Jackson argues the officers had no indication that the box truck would contain marijuana before they opened the vehicle.   However, the officers did not need probable cause that the box truck would contain evidence of a *specific* offense; rather, it was sufficient that they had probable cause that the box truck would contain evidence of *a* criminal offense. *See Dixon v. Maxwell*, 177 Ohio St. 20, 21 (1964) ("[i]t is not necessary that an officer know that a specific crime has been committed in order for him to have probable cause to make an arrest.   It is sufficient if he has reasonable grounds to believe from the circumstances that a felony has been committed, and that the accused has committed it").   Officer Carr testified he thought the three men were engaged in a theft.

{¶ 31} Jackson additionally argues the officers lacked probable cause to search the box truck because he did not specifically affiliate himself with the rental vehicles when police inquired.   However, this argument misconstrues the automobile exception to the warrant requirement.   Under the automobile exception, "the standard is probable cause to search the vehicle, not probable cause to arrest defendant or any other individual. Therefore, whether or not there was probable cause to arrest defendant does not directly impact the assessment of probable cause to search in this case." *Battle* at ¶ 33.   This argument is further undercut by Cline's statement to police that he saw the three men loading cargo into the rental vehicles.

{¶ 32} Having reviewed the entire record, we conclude the police officers had probable cause for the search of the box truck. The totality of the circumstances including the time of night, the location of the detached trailer away from the loading dock, the chaotic scene of the watermelons in the grass, and Hayward's disavowal of the rental vehicles despite Cline's statement to police that he saw the men loading cargo into the rental vehicles gave rise to a fair probability that officers would find contraband or evidence of a crime inside the box truck. Once officers opened the box truck and saw the packages of marijuana, the officers additionally had probable cause to open the cargo van. Accordingly, the trial court did not err in denying Jackson's motion to suppress on remand. Therefore, we overrule Jackson's sole assignment of error.

## IV. Disposition

{¶ 33} Based on the foregoing reasons, the trial court did not err in denying Jackson's motion to suppress. Having overruled Jackson's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., and DORRIAN, J., concur.