[Cite as *State v. Hayward*, 2016-Ohio-7671.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-1097 |
| | | (C.P.C. No. 14CR-2144) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ronald L. Hayward, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 8, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert,* for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Kura, Wilford & Schregardus Co., L.P.A.*, and *Sarah M. Schregardus*, for appellant. **Argued:** *Sarah M. Schregardus.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Ronald L. Hayward, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of possession of marijuana and one count of trafficking in drugs. For the following reasons, we reverse.

I. **Facts and Procedural History**

{¶ 2} By indictment filed April 24, 2014, plaintiff-appellee, State of Ohio, charged Hayward with one count of possession of marijuana, in violation of R.C. 2925.11, a second-degree felony; and one count of trafficking in marijuana, in violation of R.C. 2925.03, a second-degree felony. The indictment charged Hayward along with two

codefendants, Anthony A. Byrd and Cameron E. Jackson.  Hayward entered a plea of not guilty.

{¶ 3}  On May 6, 2014, Hayward filed a motion to suppress any evidence obtained by police as a result of his detention, arguing law enforcement officers conducted an unconstitutional warrantless search.  The state filed a memorandum contra, and the trial court set the matter for a hearing.

{¶ 4}  At a suppression hearing on June 8 and 9, 2015, Officer Stephen Carr of the Columbus Division of Police testified that around 3:15 a.m. on April 14, 2014, he responded to a dispatch of a possible theft in progress at a commercial trucking terminal located at 1929 Lone Eagle Street.  (June 8, 2015 Tr. Vol. I at 30.)  Officer Carr testified the information he had on arriving at the scene was that a truck driver at the trucking terminal saw several men removing cargo from a detached trailer and placing the cargo into two rental trucks.  Before Officer Carr arrived, an unmarked cruiser entered the trucking terminal and observed the rental vehicles but did not observe any people.  Officer Carr then arrived on the scene in a marked cruiser and he said a man named David Cline flagged him down and identified himself as the person who called 911 to report the possible theft and that Cline told him it was very unusual for anyone to be unloading anything at that time of day.

{¶ 5}  When he found the trailer and the two rental vehicles, Officer Carr said he observed Hayward, Byrd, and Jackson "casually just standing there," and when the officers told the men they were there to investigate a possible theft, the three men denied there was anything of that nature going on.  (June 8, 2015 Tr. Vol. I at 35.)  Officer Carr said Hayward did most of the talking.  Hayward told the officers the men had been "contracted" to unload the trailer, but when officers asked them who owned the trailer, the men could not name the owner.  Officer Carr further testified there were very large crates of watermelons sitting in the grassy area behind the trailer but when he asked the men what they were doing with the produce, the men gave a vague response about unloading the produce into the grass and possibly putting it on the loading dock later.

{¶ 6}  Officer Carr testified that the men told him that a man who worked security for the trucking terminal, "a guy named Bob," knew they were there and that "it was completely okay for them to be there."  (June 8, 2015 Tr. Vol. I at 36.)  Officer Carr then

went to a mobile home parked at the entrance of the trucking terminal, and the occupant of that mobile home put Officer Carr in touch with the person who runs the trucking terminal. Approximately one-half hour later, the manager of the trucking terminal, who Officer Carr identified as Mr. Seymour, arrived at the scene.

{¶ 7} In the time it took for Seymour to arrive at the scene, Officer Carr said he and the other officers "kind of stood around" with Hayward, Byrd, and Jackson and engaged in "very casual conversation," noting that the three men "didn't seem very concerned about [police] being there." (June 8, 2015 Tr. Vol. I at 41.) Officer Carr said the three men provided police with their identification cards. Additionally, Officer Carr said Hayward spent some time on the phone trying to get in contact with the person Hayward said had contracted the men to unload the truck. Officer Carr said the three men would have been free to leave during this approximately 30-minute period while everyone waited for Seymour to arrive "[i]f they wished to." (June 8, 2015 Tr. Vol. I at 44.)

{¶ 8} Once Seymour arrived at the trucking terminal, the police officers allowed Seymour to talk to Hayward, Byrd, and Jackson to discern whether the three men had leased a space on the lot or were working for someone who had leased a space. After a brief conversation, Seymour went to look at some paperwork in his office and then told police the three men "did not know anything about the owner of the trailer." (June 8, 2015 Tr. Vol. I at 44.) Officer Carr said Seymour also told him that it was unusual to unload crates into wet grass.

{¶ 9} Officer Carr testified that there were two Penske rental vehicles parked near the trailer: a box truck with no windows and a cargo van. The officers asked Hayward, Byrd, and Jackson about the rental vehicles several times and whether they were loading cargo into those vehicles "and each time the answer was, no, they had nothing to do with the rental trucks." (June 8, 2015 Tr. Vol. I at 48.) Officer Carr testified that "with the totality of everything that was in front of me unable to identify the owner of the trailer, unable - - this security person was not existing and the person that ran the dock saying that this simply did not look right to him," he and the other officers "believed there was an indeed a distinct possibility a theft was occurring." (June 8, 2015 Tr. Vol. I at 46.) At that point, Officer Carr said he opened the back of the box truck "expecting to find crates of

watermelons," but instead "found very large plastic wrapped packages that were numbered like they were in an exact sequence," and Officer Carr recognized the packages immediately as the typical packaging of narcotics. (June 8, 2015 Tr. Vol. I at 49.) Officer Carr said the packages "were wrapped very well," and that even though he was "pretty sure at that point they were marijuana," he "couldn't even smell" anything from the packages. (June 8, 2015 Tr. Vol. I at 62.) Officer Carr reiterated that he opened the box truck at that point because "based on everything we had, we believed that the cargo was indeed being stolen" and that the three men were putting something into the rental vehicles. (June 8, 2015 Tr. Vol. I at 48-49.)

{¶ 10} After opening the box truck, the police officers detained Hayward, Byrd, and Jackson and placed each of them in a separate police cruiser. Officer Carr said he had a discussion with the other officers after the fact that if Hayward, Byrd, and Jackson had simply gotten in a car and drove away before officers opened the box truck, the officers would not have been able to stop them. Officer Carr testified that "[u]p to that point [when officers actually detained the three men, the officers] did not feel the need to detain anybody." (June 8, 2015 Tr. Vol. I at 111.)

{¶ 11} After he looked in the box truck and detained Hayward, Byrd, and Jackson, Officer Carr testified he walked to the front of the rental van and, using his flashlight, looked in the windshield and "saw similar looking bundles in the back of the van that matched what [he] saw in the back of the box truck." (June 8, 2015 Tr. Vol. I at 50.) The cargo van did not have any windows on the rear side, but Officer Carr testified you could see to the back of the vehicle by looking through the windshield. A short time later, the K-9 unit arrived and the K-9 "[i]mmediately alerted" on the rental vehicles. (June 8, 2015 Tr. Vol. I at 50.) Eventually, the narcotics detectives came to the scene and "drew up a search warrant," at which point Officer Carr was relieved of his duties. (June 8, 2015 Tr. Vol. I at 52.) Jackson had been seated in the back of Officer Carr's cruiser but police moved him to a different cruiser so that Officer Carr could leave the scene. While he was driving to the substation, however, Officer Carr said he heard something fall in the back seat and he pulled over, finding a key for a Penske vehicle.

{¶ 12} On cross-examination, Officer Carr said he did not believe there was an immediate risk that any potential evidence inside the box truck would be destroyed or

moved away because he "didn't know it was evidence until [he] looked in" the box truck. (June 8, 2015 Tr. Vol. I at 78.)  Officer Carr also agreed that he wrote in his report of the incident that he had a "reasonable suspicion to believe that cargo was being stolen" at the time he opened the box truck.  (June 8, 2015 Tr. Vol. I at 80.)  Officer Carr further stated there was no smell of marijuana in the trucking terminal.  Additionally, Officer Carr estimated that from the time he first arrived on the scene to when he opened the box truck, more than one hour had elapsed.

{¶ 13} Officer Joshua Kinzel of the Columbus Division of Police testified that when he arrived at the trucking terminal, he saw approximately 100 watermelons lying all over the ground by the detached trailer.  Officer Kinzel said that when officers asked the three men questions, it was Hayward who gave "actual answers" and that Byrd and Jackson "kind of followed suit with whatever [Hayward] said" by nodding their heads.  (June 8, 2015 Tr. Vol. I at 126.)  Officer Kinzel said the three men were free to leave up until the point when the officers found the marijuana in the back of the box truck.  When Officer Kinzel asked the men about the rental vehicles, he said that Hayward told him "they don't know anything about the trucks," and that none of the three men indicated that the rental vehicles belonged to them.  (June 8, 2015 Tr. Vol. I at 131.)  Officer Kinzel could not recall whether Byrd or Jackson ever gave a verbal response denying any connection to the rental trucks.  Officer Kinzel testified that he, along with Officer Carr, made the collective decision to open the box truck together.  However, Officer Kinzel testified his primary reason for opening the box truck was for officer safety, though he agreed that approximately one and one-half hour passed from the time he first arrived to the time the officers opened the box truck.  Officer Kinzel testified that one of the other officers, Officer Tonya Allen, heard a rolling overhead door shut as soon as the officers arrived on the scene, and because of that, the officers "didn't know if there was somebody else in the truck." (June 8, 2015 Tr. Vol. I at 134.)

{¶ 14} Byrd testified that his friend, Shaunika Eakins, rented the box truck and cargo van in her name but that Byrd paid for the rental of the vehicles.  He said it was his understanding that even though his name was not on the rental agreement, he controlled the rental vehicles.  Further, Byrd said he never denied affiliation with the rental vehicles to police.

{¶ 15} After the suppression hearing, on July 6, 2015, the trial court denied Hayward's motion to suppress. The trial court stated its decision relied on Officer Carr's testimony, which the trial court "found to be the most credible." (July 6, 2015 Tr. at 319.) Specifically, in denying Hayward's motion to suppress, the trial court stated:

> Detective Carr also stated that on cross-examination from Mr. Byrd's attorney, that what constituted criminal activity, he thought, was the 9-1-1 call, no legitimate explanation for being there, and the conversation with Mr. Seymour that things didn't look right. He also based his reasonable suspicions on cross from Mr. Hayward's attorney stating that he was unable to - - the defendants were unable to ID the trailer owner, that there was no security person named Bob that they said it was okay for them being there, and that Mr. Seymour also said things did not look right. Further, he based his reasonable suspicions on Mr. Jackson's attorney, on Mr. Cline stating that there was unusual activity for that time of day and that Mr. Seymour said something was not right and was unusual. Therefore, there was reasonable suspicion to look in the box truck and the van.

 (July 6, 2015 Tr. at 320.)   The trial court further stated that after the officers looked in the box truck and van, there was probable cause to arrest Hayward, Byrd, and Jackson.

{¶ 16} The matter then proceeded to a joint jury trial for all three defendants beginning October 5, 2015. At the conclusion of the trial, the jury returned verdicts against Hayward, Byrd, and Jackson, finding them guilty of possession of marijuana and trafficking in marijuana. After a November 4, 2015 sentencing hearing, the trial court sentenced Hayward to 8 years' imprisonment and imposed a 12-month driver's license suspension and a $7,500 fine. The trial court journalized Hayward's convictions and sentence in a November 4, 2015 judgment entry. Hayward timely appeals.

## II. Assignments of Error

{¶ 17} Hayward assigns the following errors for our review:

> [1.] The trial court erred when it denied Ronald Hayward's Motion to Suppress in violation of the Fourth Amendment to the U.S. Constitution, and Article I, Sec. 14 of the Ohio Constitution.
>
> [2.] The trial court violated Ronald Hayward's rights to due process and a fair trial when it entered a conviction against

Mr. Hayward for Trafficking in Drugs, in the absence of sufficient evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

[3.] The trial court violated Ronald Hayward's rights to due process and a fair trial when it entered a judgment of conviction for Trafficking in Drugs, when that judgment was against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

## III.  First Assignment of Error – Motion to Suppress

{¶ 18} In his first assignment of error, Hayward argues the trial court erred when it denied his motion to suppress.  More specifically, Hayward argues reasonable suspicion was not a sufficient justification for the officers' search of the box truck.

{¶ 19} " 'Appellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.  Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.  Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " (Citations omitted.)  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

### A.  Search of the Box Truck

{¶ 20} Hayward argues the trial court erred when it applied the incorrect legal standard and found officers had reasonable suspicion to search the box truck.  Thus, Hayward asserts the evidence seized from the box truck must be suppressed and all other evidence seized must be suppressed as fruit of the poisonous tree.

{¶ 21} The Fourth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, as well as Article I, Section 14, of the Ohio Constitution, prohibits the government from conducting warrantless searches and seizures, rendering them per se unreasonable unless an exception applies.  *State v. Mendoza*, 10th Dist. No. 08AP-645, 2009-Ohio-1182, ¶ 11, citing *Katz v. United States*,

389 U.S. 347, 357 (1967), *superseded by statute on other grounds.*  There is no dispute here that police officers opened and searched the box truck without a warrant.  The parties dispute whether any of the recognized exceptions to the warrant requirement apply.

{¶ 22} In denying Hayward's motion to suppress, the trial court stated "there was reasonable suspicion to look in the box truck and the van."  (July 6, 2015 Tr. at 320.)  One of the recognized exceptions to the warrant requirement is an investigatory detention, commonly referred to as the *Terry* stop.  Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may stop or detain an individual without probable cause when the officer has reasonable suspicion, based on specific, articulable facts, that criminal activity is afoot.  *Mendoza* at ¶ 11, citing *Terry* at 21.  Accordingly, "[a]n investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have reasonable suspicion that 'the person stopped is, or is about to be, engaged in criminal activity.' " *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, ¶ 35, superseded by statute on other grounds, quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981).

{¶ 23} In *Michigan v. Long*, 463 U.S. 1032 (1983), the United States Supreme Court expanded the *Terry* warrantless search exception to protective searches of automobiles.  In *Long*, the Supreme Court held that officers could undertake a protective sweep or search of "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, * * * if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."  *Long* at 1049, quoting *Terry* at 21.  The test for the reasonableness of the search of the vehicle is " 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *Id.* at 1050, quoting *Terry* at 27.  *See also State v. Cordell*, 10th Dist. No. 12AP-42, 2013-Ohio-3009, ¶ 14.

{¶ 24} Having reviewed the record of the suppression hearing, we find the search of the box truck was not justified as a protective search under *Long* and *Terry*.  Although Officer Kinzel testified he opened the box truck out of concern for his safety, the trial court discounted that testimony and concluded officer safety was not a legitimate concern for

the officers when opening the box truck, noting Officer Kinzel admitted that approximately one and one-half hour had passed before he opened the box truck. The trial court expressly stated it found Officer Carr's testimony the most credible, and Officer Carr did not offer any testimony about a concern for his safety or the safety of the other people at the scene, nor did Officer Carr testify that there was any concern about weapons. Instead, Officer Carr described Hayward, Byrd, and Jackson as engaging in casual conversation with the officers, and noted they would have been free to leave at any time before the officers opened the box truck. When a search of a vehicle is not related to an officer's concern for his own safety or the safety of others, *Terry* and *Long* do not apply to justify a warrantless search. *State v. Parrish*, 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 28.

{¶ 25} Instead the state argues the automobile exception applies to the officer's warrantless search of the box truck. "The automobile exception is a 'specifically established and well delineated' exception to the warrant requirement." *State v. Bazrawi*, 10th Dist. No. 12AP-1043, 2013-Ohio-3015, ¶ 18, quoting *United States v. Ross*, 456 U.S. 798, 825 (1982), citing *Carroll v. United States.*, 267 U.S. 132 (1925). " '[U]nder the automobile exception to the warrant requirement, the police may search a motor vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband.' " *Bazrawi* at ¶ 18, quoting *State v. Battle*, 10th Dist. No. 10AP-1132, 2011-Ohio-6661, ¶ 33. In the context of an automobile search, probable cause is " 'a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.' " *Parrish* at ¶ 27, quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Carroll* at 149. "This probable cause standard requires specific, objective facts which would justify the issuance of a search warrant by a judge or magistrate." *Parrish* at ¶ 27. Thus, "[t]he determination of probable cause is fact-dependent and turns on what the officer knew at the time he made the stop and/or search." *Battle* at ¶ 34.

{¶ 26} Here, the trial court did not decide whether the officers had probable cause to justify the search of the box truck. Instead, in stating the officers had reasonable suspicion to open the box truck, the trial court extended the *Terry* "reasonable suspicion" test to the search of the vehicle. *See Parrish* at ¶ 28 (finding trial court erroneously

extended the *Terry* "reasonable suspicion" test to the search of the vehicle when the proper inquiry was whether the officers had probable cause to search the vehicle under the automobile exception). Thus, the trial court erred when it analyzed the search of the box truck under the rubric of reasonable suspicion rather than that of probable cause. *See State v. Muldrow*, 10th Dist. No. 15AP-1119, 2016-Ohio-4774, ¶ 24 (a trial court errs when it applies the incorrect legal standard in its ruling on a motion to suppress).

{¶ 27} Though the state concedes it was error for the trial court to deny the motion based on reasonable suspicion to search the box truck and van, the state argues the trial court misspoke and that officers had probable cause to search the box truck. However, the trial court only rendered factual findings related to its reasonable suspicion analysis. As the United States Supreme Court has explained, "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). *See also State v. Bly*, 10th Dist. No. 13AP-909, 2014-Ohio-1261, ¶ 15 (reasonable suspicion is less than the level of suspicion required for probable cause). Accordingly, we must remand the matter to the trial court to make the appropriate factual findings relevant to a probable cause analysis for the search of the box truck and then determine, in the first instance, whether officers had probable cause to search the box truck. *Muldrow* at ¶ 26 (where trial court applies the wrong legal standard in a motion to suppress, the appropriate remedy is to remand for the trial court to apply the correct legal standard with appropriate factual findings).

## B. Search of the Cargo Van

{¶ 28} Hayward argues that because the search of the box truck was first in time, the subsequent search of the cargo van is excludable as fruit of the poisonous tree. Generally, when evidence is obtained as a result of a search that violates the Fourth Amendment, a court must exclude that evidence as representing fruit of the poisonous tree. *Columbus v. Shepherd*, 10th Dist. No. 10AP-483, 2011-Ohio-3302, ¶ 42, citing *Wong v. United States*, 371 U.S. 471 (1963). The state argues, however, that even if we

were to find that officers lacked probable cause to search the box truck, the officers would have inevitably discovered the narcotics in the van.

{¶ 29} "Under the inevitable discovery doctrine, evidence obtained unconstitutionally is admissible if it 'would have been ultimately or inevitably discovered during the course of a lawful investigation.' " *State v. Ewing*, 10th Dist. No. 09AP-776, 2010-Ohio-1385, ¶ 26, quoting *State v. Perkins*, 18 Ohio St.3d 193, 196 (1985). " '[T]he burden is on the prosecution to demonstrate, within a reasonable probability, that law enforcement would have discovered the evidence in question apart from the unlawful conduct.' " *Ewing* at ¶ 26, quoting *State v. Coston*, 168 Ohio App.3d 278, 2006-Ohio-3961, ¶ 17 (10th Dist.).

{¶ 30} Because the trial court applied the incorrect legal standard and ended its analysis by determining officers had reasonable suspicion to search the box truck, the trial court did not render any factual findings with regard to the officers' subsequent search of the cargo van. Thus, on remand, if the trial court determines officers lacked probable cause to search the box truck, the trial court must then make the appropriate factual findings and apply, in the first instance, the doctrine of inevitable discovery to determine whether it should suppress the evidence related to the search of the cargo van. *See State v. Mossman*, 10th Dist. No. 13AP-959, 2014-Ohio-2620, ¶ 14 (where trial court did not reach the question of probable cause, we remanded the case to the trial court "for it to determine in the first instance the issue of whether * * * the trooper had probable cause to arrest").

## C. Standing and Abandonment

{¶ 31} Finally, we note that the state argues that Hayward lacked standing to challenge the search of the box truck and cargo van because (1) he did not have a property or possessory interest in the rental vehicles, and/or (2) he arguably abandoned the rental vehicles by not claiming ownership of them or by representing to the officers that the three men had nothing to do with the rental vehicles.

{¶ 32} "Fourth Amendment rights are personal rights which cannot be asserted vicariously." *State v. Dingess*, 10th Dist. No. 10AP-848, 2011-Ohio-5659, ¶ 28, citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus, " '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by

a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.' " *Dingess* at ¶ 28, quoting *Rakas* at 134, citing *Alderman v. United States*, 394 U.S. 165, 174 (1969).  The state argues that there was no evidence at the suppression hearing suggesting Hayward had either a property or possessory interest in the rental vehicles.

{¶ 33}  Even if Hayward had a possessory or property interest in the rental vehicles, the state argues he abandoned the rental vehicles by telling police he had nothing to do with the box truck or the cargo van.   "It is rudimentary that one does not have standing to object to a search and seizure of property that he has voluntarily abandoned."  *State v. Freeman*, 64 Ohio St.2d 291, 296 (1980), citing *Abel v. United States*, 362 U.S. 217 (1960).  However, " '[a]bandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.' " *Freeman* at 297, quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973).  Thus, abandonment is a question of fact.  *See State v. Wallace*, 10th Dist. No. 99AP-802 (Mar. 30, 2000) (stating "[a] defendant's intent is a question of fact"), citing *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus.

{¶ 34}  Though the state argued lack of standing to the trial court, the trial court did not engage in a standing analysis and did not make any factual findings related to Hayward's possessory or property interest in the rental vehicles or possible abandonment of the rental vehicles.  Accordingly, on remand, the trial court must make the appropriate factual findings and apply the appropriate legal standard to determine whether Hayward had standing to object to the search of the rental vehicles.

{¶ 35}  For all of these reasons, we sustain Hayward's first assignment of error.

## IV.   Second and Third Assignments of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 36} In his second and third assignments of error, Hayward argues the sufficiency and manifest weight of the evidence did not support his convictions.  However, our resolution of Hayward's first assignment of error renders moot his second and third assignments of error, and we need not address them.  Thus, we render moot Hayward's second and third assignments of error.

## V. Disposition

{¶ 37} Based on the foregoing reasons, the trial court erred when it analyzed the search of the box truck under the standard of reasonable suspicion rather than probable cause. Because of the trial court's erroneous application of the legal standard, the trial court did not make the appropriate factual findings necessary to apply the probable cause analysis or to address the state's arguments regarding inevitable discovery and abandonment in the first instance. Having sustained Hayward's first assignment of error and rendered moot Hayward's second and third assignments of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter to that court with instructions for the court to consider the evidence at the suppression hearing and make, in the first instance, the appropriate legal determinations consistent with this decision.

*Judgment reversed; cause remanded with instructions.*

BROWN, J., concurs.
HORTON, J., concurs in part and dissents in part.

HORTON, J., concurring in part and dissenting in part.

{¶ 38} I respectfully dissent from the majority's disposition of assignment of error one. Based on a de novo review of the facts established at the motion to suppress hearing, probable cause to search the box truck and cargo van was not present. Accordingly, I would sustain appellant's motion to suppress. I concur with the majority that the remaining assignments of error are moot.

---