[Cite as *State v. Byrd*, 2018-Ohio-1069.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-387 |
| | | (C.P.C. No. 14CR-2142) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Anthony A. Byrd, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 23, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Anzelmo Law*, and *James A. Anzelmo*, for appellant. **Argued:** *James A. Anzelmo.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Anthony A. Byrd, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of possession of marijuana and one count of trafficking in drugs. For the following reasons, we affirm in part and reverse in part.

I. Facts and Procedural History

{¶ 2} By indictment filed April 24, 2014, plaintiff-appellee, State of Ohio, charged Byrd with one count of possession of marijuana, in violation of R.C. 2925.11, a second-degree felony; and one count of trafficking in marijuana, in violation of R.C. 2925.03, a second-degree felony. The indictment charged Byrd along with two codefendants, Cameron E. Jackson and Ronald L. Hayward. Byrd entered a plea of not guilty.

{¶ 3} On July 18, 2014, Byrd filed a motion to suppress any physical evidence and statements obtained by police as a result of his detention, arguing law enforcement officers conducted an unconstitutional warrantless search. The state filed a memorandum contra Byrd's motion to suppress, and the trial court set the matter for hearing.

{¶ 4} At a suppression hearing on June 8 and 9, 2015, Officer Stephen Carr of the Columbus Division of Police testified that around 3:15 a.m. on April 14, 2014, he responded to a dispatch of a possible theft in progress at a commercial trucking terminal located at 1929 Lone Eagle Street. Officer Carr testified the information he had on arriving at the scene was that a truck driver at the trucking terminal saw several men removing cargo from a detached trailer and placing the cargo into two rental trucks. Before Officer Carr arrived, an unmarked cruiser entered the trucking terminal and observed the rental vehicles but did not observe any people. Officer Carr then arrived on the scene in a marked cruiser and he said a man named David Cline flagged him down and identified himself as the person who called 911 to report the possible theft and that Cline told him it was very unusual for anyone to be unloading anything at that time of day. Cline said he saw three men moving cargo from a trailer into two Penske rental trucks.

{¶ 5} When he found the trailer and the two rental vehicles, Officer Carr said he observed Byrd, Hayward, and Jackson "casually just standing there," and when the officers told the men they were there to investigate a possible theft, the three men denied there was anything of that nature going on. (June 8, 2015 Tr. Vol. I at 35.) Officer Carr said Hayward did most of the talking. Hayward told the officers the men had been "contracted" to unload the trailer, but when officers asked them who owned the trailer, the men could not name the owner. (June 8, 2015 Tr. Vol. I at 35.) Officer Carr further testified there were very large crates of watermelons sitting in the grassy area behind the trailer but when he asked the men what they were doing with the produce, the men gave a vague response about unloading the produce into the grass and possibly putting it on the loading dock later.

{¶ 6} Officer Carr testified that the men told him that a man who worked security for the trucking terminal, "a guy named Bob," knew they were there and that "it was completely okay for them to be there." (June 8, 2015 Tr. Vol. I at 36.) Officer Carr then went to a mobile home parked at the entrance of the trucking terminal, and the occupant of that mobile home put Officer Carr in touch with the person who runs the trucking

terminal. Approximately one-half hour later, the manager of the trucking terminal, whom Officer Carr identified as Mr. Seymour, arrived at the scene.

{¶ 7} In the ti me it took for Seymour to arrive at the scene, Officer Carr said he and the other officers "kind of stood around" with Byrd, Hayward, and Jackson and engaged in "very casual conversation," noting that the three men "didn't seem very concerned about [police] being there." (June 8, 2015 Tr. Vol. I at 41.) Officer Carr said the three men provided police with their identification cards. Additionally, Officer Carr said Hayward spent some time on the phone trying to get in contact with the person Hayward said had contracted the men to unload the truck. Officer Carr said the three men would have been free to leave during this approximately 30-minute period while everyone waited for Seymour to arrive "[i]f they wished to." (June 8, 2015 Tr. Vol. I at 44.)

{¶ 8} Once Seymour arrived at the trucking terminal, the police officers allowed Seymour to talk to Byrd, Hayward, and Jackson to discern whether the three men had leased a space on the lot or were working for someone who had leased a space. After a brief conversation, Seymour went to look at some paperwork in his office and then told police the three men "did not know anything about the owner of the trailer." (June 8, 2015 Tr. Vol. I at 44.) Officer Carr said Seymour also told him that it was unusual to unload crates into wet grass.

{¶ 9} Officer Carr testified that there were two Penske rental vehicles parked near the trailer: a box truck with no windows and a cargo van. The officers asked Byrd, Hayward, and Jackson about the rental vehicles several times and whether they were loading cargo into those vehicles "and each time the answer was, no, they had nothing to do with the rental trucks." (June 8, 2015 Tr. Vol. I at 48.) Officer Carr testified that "with the totality of everything that was in front of me unable to identify the owner of the trailer, unable - - this security person was not existing and the person that ran the dock saying that this simply did not look right to him," he and the other officers "believed there was an indeed a distinct possibility a theft was occurring." (June 8, 2015 Tr. Vol. I at 46.) At that point, Officer Carr said he opened the back of the box truck "expecting to find crates of watermelons," but instead "found very large plastic wrapped packages that were numbered like they were in an exact sequence," and Officer Carr recognized the packages immediately as the typical packaging of narcotics. (June 8, 2015 Tr. Vol. I at 49.) Officer Carr said the

packages "were wrapped very well," and that even though he was "pretty sure at that point they were marijuana," he "couldn't even smell" anything from the packages. (June 8, 2015 Tr. Vol. I at 62.) Officer Carr reiterated that he opened the box truck at that point because "based on everything we had, we believed that the cargo was indeed being stolen" and that the three men were putting something into the rental vehicles. (June 8, 2015 Tr. Vol. I at 48-49.)

{¶ 10} After opening the box truck, the police officers detained Byrd, Hayward, and Jackson and placed each of them in a separate police cruiser. Officer Carr said he had a discussion with the other officers after the fact that if Byrd, Hayward, and Jackson had simply gotten in a car and drove away before officers opened the box truck, the officers would not have been able to stop them. Officer Carr testified that "[u]p to that point [when officers actually detained the three men, the officers] did not feel the need to detain anybody." (June 8, 2015 Tr. Vol. I at 111.)

{¶ 11} After he looked in the box truck and detained Byrd, Hayward, and Jackson, Officer Carr testified he walked to the front of the rental van and, using his flashlight, looked in the windshield and "saw similar looking bundles in the back of the van that matched what [he] saw in the back of the box truck." (June 8, 2015 Tr. Vol. I at 50.) The cargo van did not have any windows on the rear side, but Officer Carr testified you could see to the back of the vehicle by looking through the windshield. A short time later, the K-9 unit arrived, and the K-9 "[i]mmediately alerted" on the rental vehicles. (June 8, 2015 Tr. Vol. I at 50.) Eventually, the narcotics detectives came to the scene and "drew up a search warrant," at which point Officer Carr was relieved of his duties. (June 8, 2015 Tr. Vol. I at 52.) Jackson had been seated in the back of Officer Carr's cruiser but police moved him to a different cruiser so that Officer Carr could leave the scene. While he was driving to the substation, however, Officer Carr said he heard something fall in the back seat and he pulled over, finding a key for a Penske vehicle.

{¶ 12} On cross-examination, Officer Carr said he did not believe there was an immediate risk that any potential evidence inside the box truck would be destroyed or moved away because he "didn't know it was evidence until [he] looked in" the box truck. (June 8, 2015 Tr. Vol. I at 78.) Officer Carr also agreed that he wrote in his report of the incident that he had a "reasonable suspicion to believe that cargo was being stolen" at the

time he opened the box truck. (June 8, 2015 Tr. Vol. I at 80.) Officer Carr further stated there was no smell of marijuana in the trucking terminal. Additionally, Officer Carr estimated that from the time he first arrived on the scene to when he opened the box truck, more than one hour had elapsed.

{¶ 13} Officer Joshua Kinzel of the Columbus Division of Police testified that when he arrived at the trucking terminal, he saw approximately 100 watermelons lying all over the ground by the detached trailer. Officer Kinzel said that when officers asked the three men questions, it was Hayward who gave "actual answers" and that Byrd and Jackson "kind of followed suit with whatever [Hayward] said" by nodding their heads. (June 8, 2015 Tr. Vol. I at 126.) Officer Kinzel said the three men were free to leave up until the point when the officers found the marijuana in the back of the box truck. When Officer Kinzel asked the men about the rental vehicles, he said that Hayward told him "they don't know anything about the trucks," and that none of the three men indicated that the rental vehicles belonged to them. (June 8, 2015 Tr. Vol. I at 131.) Officer Kinzel could not recall whether Byrd or Jackson ever gave a verbal response denying any connection to the rental trucks. Officer Kinzel testified that he, along with Officer Carr, made the collective decision to open the box truck together. However, Officer Kinzel testified his primary reason for opening the box truck was for officer safety, though he agreed that approximately one and one-half hour passed from the time he first arrived to the time the officers opened the box truck. Officer Kinzel testified that one of the other officers, Officer Tonya Allen, heard a rolling overhead door shut as soon as the officers arrived on the scene, and because of that, the officers "didn't know if there was somebody else in the truck." (June 8, 2015 Tr. Vol. I at 134.)

{¶ 14} Byrd testified that his friend, Shaunika Eakins, rented the box truck and cargo van in her name but that Byrd paid for the rental of the vehicles. He said it was his understanding that even though his name was not on the rental agreement, he controlled the rental vehicles. Further, Byrd said he never denied affiliation with the rental vehicles to police.

{¶ 15} After the suppression hearing, on July 6, 2015, the trial court denied Byrd's motion to suppress. The trial court stated its decision relied upon Officer Carr's testimony, which the trial court "found to be the most credible." (July 6, 2015 Tr. at 319.) Specifically, in denying Byrd's motion to suppress, the trial court stated:

Detective Carr also stated that on cross-examination from Mr. Byrd's attorney, that what constituted criminal activity, he thought, was the 9-1-1 call, no legitimate explanation for being there, and the conversation with Mr. Seymour that things didn't look right. He also based his reasonable suspicions on cross from Mr. Hayward's attorney stating that he was unable to - - the defendants were unable to ID the trailer owner, that there was no security person named Bob that they said it was okay for them being there, and that Mr. Seymour also said things did not look right. Further, he based his reasonable suspicions on Mr. Jackson's attorney, on Mr. Cline stating that there was unusual activity for that time of day and that Mr. Seymour said something was not right and was unusual. Therefore, there was reasonable suspicion to look in the box truck and the van.

(July 6, 2015 Tr. at 320.) The trial court further stated that after the officers looked in the box truck and van, there was probable cause to arrest Byrd, Hayward, and Jackson.

{¶ 16} The matter then proceeded to a joint jury trial for all three defendants beginning October 5, 2015. The evidence at trial largely duplicated the evidence presented at the suppression hearing, though additional witnesses testified at trial. Specifically, Claude W. Seymour, Jr., the manager of the trucking yard who goes by the name Wes, did not testify at the suppression hearing but did testify at trial. Seymour testified that ordinarily a trailer would be backed up to the dock so that a forklift could access the inside of the trailer to unload it. However, Seymour said that the way the trailer that Byrd, Hayward, and Jackson were unloading was positioned with the rear of the trailer abutting a wet, grassy area, there would be no way to use a forklift to unload it. Seymour recalled one of the defendants, though he was not sure which one, telling him they planned to use a forklift to reload the trailer. Seymour said that statement did not make sense to him given the location of the trailer.

{¶ 17} The state also presented evidence at trial regarding the amount of marijuana found at the scene. Police recovered a total of 122 packages of marijuana. Of that total, 66 packages came from the box truck, 46 packages came from the van, and 10 packages came from the trailer, in the bottom of a large box concealed by watermelons. All together, the packages weighed approximately 2,900 pounds. Further testing revealed the packages contained a total of 44,000 grams of marijuana.

{¶ 18} At the conclusion of the trial, the jury returned verdicts against Byrd, Hayward, and Jackson, finding them guilty of possession of marijuana and trafficking in marijuana. After a November 4, 2015 sentencing hearing, the trial court merged the possession count into the trafficking count and sentenced Byrd to 8 years' imprisonment and imposed a 12-month driver's license suspension and a $7,500 fine. The trial court journalized Byrd's convictions and sentence in a November 4, 2015 judgment entry.

{¶ 19} Byrd appealed, arguing that the trial court erred in denying the motion to suppress. This court agreed with Byrd, concluding the trial court erred in applying the reasonable suspicion standard to the search of the box truck and that the trial court should have determined whether there was probable cause to search the box truck under the automobile exception to the warrant requirement. *State v. Byrd*, 10th Dist. No. 15AP-1091, 2016-Ohio-7670, ¶ 24-26 ("*Byrd I*"). We remanded the case for the trial court to "make the appropriate factual findings relevant to a probable cause analysis for the search of the box truck and then determine, in the first instance, whether officers had probable cause to search the box truck." *Id.* at ¶ 27.

{¶ 20} On remand, the trial court once again denied Byrd's motion to suppress. The trial court issued a written order and entry on March 30, 2017 concluding "[t]he totality of the circumstances leading up to the opening of the box truck gave the officers ample probable cause to believe that the box truck would contain contraband and search the box truck under the automobile exception." (Order & Entry at 6.) In denying Byrd's motion to suppress, the trial court additionally concluded the officers had probable cause for their subsequent search of the cargo van.

{¶ 21} Subsequently, on May 1, 2017, the trial court issued an amended judgment entry noting it had overruled Byrd's motion to suppress on remand and reinstating Byrd's original judgment of conviction entered November 4, 2015. Byrd timely appeals.

## II. Assignments of Error

{¶ 22} Byrd assigns the following errors for our review:

> [1.] The trial court erred by denying Byrd's motion to suppress evidence that police obtained in violation of his right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution.

[2.] Byrd's convictions for trafficking marijuana and possession of marijuana are based on insufficient evidence, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.

[3.] Byrd's convictions for trafficking marijuana and possession of marijuana are against the manifest weight of the evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.

[4.] The trial court unlawfully ordered Byrd to serve the eight-year prison sentence, imposed for the merged drug charges, consecutive to the nine-month-prison sentence, imposed in an unrelated conviction, in violation of his rights to due process, guaranteed by Section 10, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

[5.] Byrd received ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

## III.  First Assignment of Error – Motion to Suppress

{¶ 23}  In his first assignment of error, Byrd argues the trial court erred in overruling his motion to suppress.  More specifically, Byrd asserts the officers lacked probable cause for the search of the box truck.

{¶ 24}  " 'Appellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.  Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.  Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " (Citations omitted.)  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 25}  The Fourth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, as well as Article I, Section 14 of the Ohio

Constitution, prohibits the government from conducting warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. *State v. Mendoza*, 10th Dist. No. 08AP-645, 2009-Ohio-1182, ¶ 11, citing *Katz v. United States*, 389 U.S. 347, 357 (1967), *superseded by statute on other grounds*. There is no dispute here that the police officers opened and searched the box truck without a warrant. In *Byrd I*, we determined the automobile exception to the warrant requirement would apply to the search of the box truck, and we remanded the matter to the trial court to determine whether the officers had probable cause for the warrantless search of the box truck. *Byrd I* at ¶ 25-27.

{¶ 26} "The automobile exception is a 'specifically established and well delineated' exception to the warrant requirement." *State v. Bazwari*, 10th Dist. No. 12AP-1043, 2013-Ohio-3015, ¶ 18, quoting *United States v. Ross*, 456 U.S. 798, 825 (1982), citing *Carroll v. United States*, 267 U.S. 132 (1925). " '[U]nder the automobile exception to the warrant requirement, the police may search a motor vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband.' " *Bazwari* at ¶ 18, quoting *State v. Battle*, 10th Dist. No. 10AP-1132, 2011-Ohio-6661, ¶ 33. In the context of an automobile search, probable cause is " 'a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.' " *State v. Parrish*, 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 27, quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Carroll* at 149. "This probable cause standard requires specific, objective facts which would justify the issuance of a search warrant by a judge or magistrate." *Parrish* at ¶ 27. Thus, "[t]he determination of probable cause is fact-dependent and turns on what the officer knew at the time he made the stop and/or search." *Battle* at ¶ 34. "Probable cause sufficient to justify a search exists where, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*, citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

{¶ 27} In concluding the totality of the circumstances leading up to the opening of the box truck gave the officers probable cause to search the box truck under the automobile exception to the warrant requirement, the trial court listed the factors that aided its decision, including:

> (1) the chaotic scene of broken and intact watermelons in the wet grass, (2) statements regarding the unusualness of cargo being unloaded in the middle of the night, (3) unloading hundreds of presumably heavy watermelons near the wet grass as opposed to the loading dock with access to a forklift, ([4]) the defendants' inability to state who owned the trailer, ([5]) the defendants' reference to the non-existent "Bob" the security guard, ([6]) Hayward's express disavowal of the defendants having any affiliation with either the rental van or the rental truck in contrast to Cline's statements that he saw men loading cargo into the trucks, ([7]) Hayward's statement that the defendants had nothing to do with the rental van or truck, which would lead one to wonder where they were going to put the watermelons after unloading them, ([8]) Seymour's conclusion that the defendants' explanation for what they were doing was nonsensical, and ([9]) Defendant's vague answers.

(Order & Entry at 6-7.)

{¶ 28} Giving deference to the trial court's factual findings, we must independently determine whether these facts are sufficient to conclude the officers had probable cause for the search of the box truck. *Roberts* at ¶ 100. We are mindful that probable cause is a "fluid concept" based on very specific, particular factual contexts, and " 'because the mosaic which is analyzed for a * * * probable-cause inquiry is multifaceted, "one determination will seldom be a useful 'precedent' for another." ' " *State v. Morgan*, 10th Dist. No. 05AP-552, 2006-Ohio-5297, ¶ 26, quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996), quoting *Gates* at 238 fn. 11.

{¶ 29} Byrd argues the officers had no indication that the box truck would contain marijuana before they opened the vehicle. However, the officers did not need probable cause that the box truck would contain evidence of a *specific* offense; rather, it was sufficient that they had probable cause that the box truck would contain evidence of *a* criminal offense. *See Dixon v. Maxwell*, 177 Ohio St. 20, 21 (1964) ("[i]t is not necessary that an officer know that a specific crime has been committed in order for him to have probable cause to make an arrest. It is sufficient if he has reasonable grounds to believe from the circumstances that a felony has been committed, and that the accused has committed it"). Officer Carr testified he thought the three men were engaged in a theft.

{¶ 30} Byrd additionally argues the officers lacked probable cause to search the box truck because he remained silent and did not affiliate himself with the rental trucks. However, this argument misconstrues the automobile exception to the warrant requirement. Under the automobile exception, "the standard is probable cause to search the vehicle, not probable cause to arrest defendant or any other individual. Therefore, whether or not there was probable cause to arrest defendant does not directly impact the assessment of probable cause to search in this case." *Battle* at ¶ 33.

{¶ 31} Having reviewed the entire record, we conclude the police officers had probable cause for the search of the box truck. The totality of the circumstances including the time of night, the location of the detached trailer away from the loading dock, the chaotic scene of the watermelons in the grass, and Hayward's disavowal of the rental vehicles despite Cline's statement to police that he saw the men loading cargo into the rental vehicles gave rise to a fair probability that officers would find contraband or evidence of a crime inside the box truck. Once officers opened the box truck and saw the packages of marijuana, the officers additionally had probable cause to open the cargo van. Accordingly, the trial court did not err in denying Byrd's motion to suppress on remand. Therefore, we overrule Byrd's first assignment of error.

## IV. Second Assignment of Error – Sufficiency of the Evidence

{¶ 32} In his second assignment of error, Byrd argues there was insufficient evidence to support his convictions.

{¶ 33} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 34} Byrd was convicted of trafficking marijuana, in violation of R.C. 2925.03, and possession of marijuana, in violation of R.C. 2925.11. R.C. 2925.03(A)(2) provides that "[n]o person shall * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when

the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person." R.C. 2925.11(A) provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Thus, to prove both of these offenses, the state was required to show that Byrd acted knowingly.

{¶ 35} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime. *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-4075, ¶ 22. Culpable mental states are frequently demonstrated through circumstantial evidence. *Id*; *State v. Stanley*, 10th Dist. No. 06AP-323, 2007-Ohio-2786, ¶ 31 (noting that "[a]bsent an admission" by the defendant, the surrounding facts and circumstances, including the defendant's action, determine whether a defendant knowingly possessed a controlled substance).

{¶ 36} Byrd argues the evidence did not demonstrate he either knowingly possessed marijuana or knowingly trafficked marijuana. As the Supreme Court of Ohio has held, "[t]he element of scienter in a narcotics possession case consists of two branches; that the defendant knew that the substance was in his possession, and that he knew the substance was a narcotic." *State v. Dempsey*, 22 Ohio St.2d 219, 222 (1970). Essentially, Byrd argues the state failed to prove he knew what was inside the packages found inside the box truck and cargo van.

{¶ 37} As an initial matter, Byrd asserts the packages in the box truck and cargo van were not readily identifiable as marijuana, pointing to Seymour's statement that the packages looked like "a comforter set that you might find in a store." (Oct. 7, 2015 Tr. Vol. 2 at 251.) Byrd additionally notes police testified there was no odor of marijuana at the scene. However, Officer Carr testified, based on his experience as a police officer and someone who frequently works with narcotics, he "recognized it immediately that [the packages] had to be narcotics of some type." (Oct. 7, 2015 Tr. Vol. 2 at 203.)

{¶ 38} Byrd additionally argues his calm demeanor when officers arrived on the scene undermines any inference that he knew what was inside the packages. However,

remaining calm when confronted by law enforcement officers has little impact on the circumstantial evidence supporting a defendant's knowledge of the contents of a package. *See Stanley* at ¶ 31-33 (rejecting a defendant's argument that there was insufficient evidence that he knowingly possessed cocaine where the defendant's actions when police arrived on the scene "were consistent with a person who is innocent" merely because he did not run away from the officers, attempt to dispose of the drugs, or evade the police).

{¶ 39} Byrd's main argument is that the state could not prove he had knowledge of the contents of the packages because he never admitted to knowing what was inside and there was no evidence he ever attempted to know what was inside the packages. However, we are mindful that, absent an admission by a defendant, we may infer knowledge from all the surrounding circumstances. *Stanley* at ¶ 31. The evidence at trial demonstrated that Byrd paid for the rental trucks, and Cline said in his 911 call that he saw the three men loading the packages from the detached trailer into the rental vehicles. Moreover, to the extent Byrd argues the state cannot prove he knew the contents of the packages because he never inquired, R.C. 2901.22(B) specifically provides that "[w]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and *fails to make inquiry or acts with a conscious purpose to avoid learning the fact*." (Emphasis added.) Stated another way, Byrd cannot claim ignorance of the contents of the packages when the circumstantial evidence demonstrates he believed there was a high probability the packages contained narcotics but purposefully avoided learning the contents with certainty.

{¶ 40} Considering all the circumstantial evidence, we conclude that, construing the facts in a light most favorable to the state, there was sufficient evidence to prove Byrd knowingly possessed and trafficked in marijuana. In addition to the factors listed above, we note that the time of night and the chaotic scene of the trailer facing away from the loading dock with watermelons strewn about all support an inference that Byrd had knowledge of the contents of the packages and worked to move the packages quickly and without detection. Thus, because we conclude sufficient evidence supports Byrd's convictions, we overrule Byrd's second assignment of error.

## V. Third Assignment of Error – Manifest Weight of the Evidence

{¶ 41} In his third assignment of error, Byrd argues the manifest weight of the evidence does not support his convictions.

{¶ 42} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 43} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 44} Byrd restates much of his argument regarding sufficiency of the evidence for purposes of his manifest weight argument. Essentially, Byrd argues the jury should not have concluded Byrd knew the contents of the packages discovered in the box truck and cargo van. In light of the evidence discussed above, as well as the record in its entirety, we do not find that the jury clearly lost its way in concluding that Byrd committed the offenses of possession of drugs and trafficking in drugs. The circumstantial evidence of the time of

night, the chaotic scene, and Byrd's actions in working to move the packages from the detached trailer into the rental vehicles for which Byrd paid all supported the conclusion that Byrd acted with knowledge.

{¶ 45} Byrd additionally argues the jury impermissibly used Hayward's statements to police to implicate Byrd in the offenses. However, as we discussed above, even without Hayward's statements to the officers denying affiliation with the rental vehicles, there was still ample evidence to support the conclusion that Byrd knowingly possessed and trafficked in marijuana. Therefore, we find the manifest weight of the evidence supports Byrd's convictions, and we overrule Byrd's third assignment of error.

## VI.  Fourth Assignment of Error – Imposition of Consecutive Sentences

{¶ 46}  In his fourth assignment of error, Byrd argues the trial court erred in ordering his sentence to run consecutive to his sentence in a separate, unrelated offense. More specifically, Byrd asserts the trial court failed to make the required findings under R.C. 2929.14(C)(4).

{¶ 47} Because Byrd did not challenge the trial court's imposition of consecutive sentences at his sentencing hearing, we may reverse Byrd's sentence only if the sentence constitutes plain error. *State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 7. This court has consistently determined a trial court's failure to make the findings required by R.C. 2929.14(C)(4) is "plain error as a matter of law." *State v. Bailey*, 10th Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 46. *See also State v. Smith*, 10th Dist. No. 14AP-123, 2014-Ohio-3700, ¶ 7; *State v. Fair*, 10th Dist. No. 13AP-901, 2014-Ohio-2788, ¶ 22; *State v. Adams*, 10th Dist. No. 13AP-783, 2014-Ohio-1809, ¶ 7.

{¶ 48} The state concedes that the trial court erred by not making the required findings under R.C. 2929.14(C) before imposing consecutive sentences. However, the state notes its continued objection to this court's application of the plain-error-as-a-matter-of-law standard in these cases. " 'Although the state disagrees with the plain-error-as-a-matter-of-law standard employed in [our] case[], we are bound by the doctrine of stare decisis and will follow this court's precedent.' " *State v. Bluhm*, 10th Dist. No. 15AP-938, 2016-Ohio-7126, ¶ 58, quoting *State v. Phipps*, 10th Dist. No. 13AP-640, 2014-Ohio-2905, ¶ 57.

{¶ 49} The record indicates the trial court did not make the required findings under R.C. 2929.14(C)(4) before imposing consecutive sentences. Accordingly, we must remand the matter to the trial court for resentencing for the trial court to determine whether consecutive sentences are appropriate and, if so, to make the proper statutory findings at the resentencing hearing and incorporate those findings in the sentencing entry. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 94. Therefore, we sustain Byrd's fourth assignment of error.

## VII. Fifth Assignment of Error – Ineffective Assistance of Counsel

{¶ 50} In his fifth and final assignment of error, Byrd argues he was deprived of his constitutional right to the effective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, Byrd must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Byrd to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Byrd can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Byrd must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 51} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Byrd contends his trial counsel was ineffective in (1) failing to file an affidavit of indigency to avoid the mandatory fine under R.C. 2929.18(B)(1), and (2) failing to request a jury instruction to preclude the jury from considering Hayward's statements against Byrd.

### A. Affidavit of Indigency

{¶ 52} Byrd's first instance of alleged ineffective assistance of counsel is that his counsel failed to file an affidavit of indigency on his behalf as part of the sentencing proceedings, thereby subjecting him to a mandatory fine as part of his sentence under R.C. 2929.18(B)(1). However, having determined in our resolution of Byrd's fourth assignment of error that we must remand this matter for resentencing, we find this argument to be

moot and we need not address it.  Thus, we overrule as moot the portion of Byrd's fifth assignment of error related to his trial counsel's failure to file an affidavit of indigency prior to sentencing.

### B.  Jury Instruction

{¶ 53}  Byrd's second instance of alleged ineffective assistance of counsel is his counsel's failure to request a jury instruction to preclude the jury from considering Hayward's statements against Byrd.

{¶ 54}  As a general rule, strategic and tactical decisions of trial counsel cannot form the basis of a claim of ineffective assistance of counsel.  *See, e.g., Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590.  This court has previously noted that a decision not to request a particular jury instruction is a matter of trial strategy, so such a decision generally does not substantiate a claim of ineffective assistance of counsel.  *State v. Glenn-Coulverson*, 10th Dist. No. 16AP-265, 2017-Ohio-2671, ¶ 56, citing *State v. Morris*, 9th Dist. No. 22089, 2005-Ohio-1136, ¶ 100.

{¶ 55}  Byrd argues his counsel should have requested a limiting instruction under Evid.R. 105, which provides that "when evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request of a party, shall restrict the evidence to its proper scope and instruct the jury accordingly."  We need not decide whether the decision not to request such an instruction fell outside the realm of reasonable trial strategy because, as we noted in our resolution of Byrd's third assignment of error, even without Hayward's statements to police denying affiliation with the rental vehicles, there was still ample evidence to conclude Byrd knowingly possessed and trafficked in drugs.  *See, e.g., State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 69 ("[e]ven without [a defendant's] admittedly damaging testimony, the state had already presented ample evidence of [the defendant's] guilt," so the appellant was unable to satisfy the prejudice prong of the ineffective assistance analysis).  Thus, Byrd is unable to demonstrate the requisite prejudice necessary to substantiate a claim of ineffective assistance of counsel.

{¶ 56}  Because Byrd did not receive the ineffective assistance of counsel, we overrule the portion of Byrd's fifth and final assignment of error related to his argument regarding the jury instruction.

## VIII. Disposition

{¶ 57} Based on the foregoing reasons, the trial court did not err in denying Byrd's motion to suppress, the sufficiency and manifest weight of the evidence supported Byrd's convictions, and Byrd did not receive the ineffective assistance of counsel. However, because the trial court erred in imposing consecutive sentences without making the requisite findings under R.C. 2929.14(C)(4), we must remand this matter for resentencing. Having overruled Byrd's first, second, third, and part of Byrd's fifth assignment of error, and having sustained Byrd's fourth assignment of error, rendering moot the other portion of Byrd's fifth assignment of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this matter to that court for resentencing.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

BROWN, P.J., and DORRIAN, J., concur.